## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARY KATE BREEDEN**<br>**2908 Russell Road**<br>**Alexandria, Virginia 22305,**<br><br>　　　**Plaintiff,**<br><br>**v.**<br><br>**Novartis Pharmaceuticals Corporation**<br>**One Health Plaza**<br>**East Hanover, New Jersey 07936-1080,**<br><br>**Serve Registered Agent:**<br><br>　　　**CT Corporation**<br>　　　**1015 15th Street NW, Suite 1000**<br>　　　**Washington, DC 20005,**<br><br>　　　**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Case No.** _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CIVIL COMPLAINT FOR EQUITABLE
## AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1.　　　Plaintiff, Mary Kate Breeden ("Breeden"), files this Complaint of unlawful sex-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2007) ("Title VII") and interference in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2615(a)(1) (2007) ("FMLA") against Novartis Pharmaceuticals Corporation ("Novartis").

## JURISDICTION AND VENUE

2.         This Court has jurisdiction over this action pursuant to both 28 U.S.C. § 1331

and 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in

controversy exceeds $75,000.

3.         Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a

substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

4.         Plaintiff Mary Kate Breeden is domiciled in Virginia and, until her wrongful

termination on January 26, 2008, was a Transplant Account Manager ("TAM") for Novartis.

The majority of the accounts for which Breeden was responsible at the time of her

termination were located in Washington, D.C.

5.         Defendant Novartis Pharmaceuticals Corporation is a Delaware corporation

that conducts business in Washington, D.C.  Novartis is engaged in commerce or an industry

or activity affecting commerce and employs 50 or more employees.

## FACTUAL ALLEGATIONS

**Background**

6.         Novartis Pharmaceuticals Corporation researches, develops, and markets

prescription drugs to treat a range of disease areas including, but not limited to, organ

transplantation.

7.         Novartis hired Breeden on or about November 20, 2000 as one of twenty-six

(26) Transplant Business Unit ("TBU" or "Unit") Field Account Representatives nationwide.

8.      Throughout Breeden's employment, Novartis rated Breeden a "strong performer" or "good solid performer" in semi-annual and annual performance evaluations because she consistently met Novartis' performance goals for her.

9.      Throughout Breeden's employment, supervisors consistently praised Breeden's performance.

10.     Breeden's supervisors consistently praised Breeden for her technical knowledge, client interaction and service, and dedication to her position.

11.     In 2006, Breeden's supervisor commended her for ranking seven (7) in sales among twenty-five (25), or in the top one-third, of her comparators nationwide.

12.     At the date of her hire, Breeden was not pregnant, was not trying to become pregnant, and had no children.

13.     At the time of Breeden's hire and throughout the course of her employment, none of Breeden's female comparators who had young children remained with Novartis more than about a year following maternity leave due, in part, to Novartis' negative treatment of female employees with young children.

**Novartis Was on Notice of Breeden's Intent to Undergo IVF Treatment as a Result of an Invasive and Inappropriate Conversation Prompted by TBU Vice President O'Callaghan**

14.     During a field visit with Breeden in or about June 2004, Brian O'Callaghan randomly asked Breeden why she did not have any children.

15.     Although Breeden was uncomfortable with O'Callaghan's question, Breeden felt obligated to respond because O'Callaghan was Breeden's superior.

16.     In response to O'Callaghan's question during the field visit, Breeden explained to O'Callaghan in confidence that she hoped to have children and was undergoing in IVF treatment to conceive.

17.     Breeden informed O'Callaghan that no one in Novartis was aware of her effort to become pregnant.

18.     Rather than drop the issue, O'Callaghan then asked Breeden if she planned to return to work after having a child.

19.     Breeden affirmed to O'Callaghan that she would return to work after giving birth if she were fortunate enough to have a child.

20.     Despite Breeden's obvious discomfort and repeated attempts to change the subject of the conversation back to work-related matters, O'Callaghan continued to ask Breeden personal questions about why she was unable to conceive and her work plans post-pregnancy.

21.     Breeden felt incredibly embarrassed by, and uncomfortable with, O'Callaghan's deeply personal questions during the field visit on or about June 2004.

22.     O'Callaghan never asked any male employee of Novartis questions about having or attempting to conceive children.

23.     O'Callaghan broke the confidentiality of his discussion with Breeden and informed Transplant Account Manager Mendy McGuire ("McGuire") and other TBU employees that Breeden was utilizing an IVF process to become pregnant.

24.     Because of O'Callaghan, Breeden's attempts to become pregnant utilizing IVF became widely known among Novartis' TBU employees.

**Breeden Underwent In Vitro Fertilization Treatment and Became Pregnant**

25.     In or about 2004, Breeden underwent in vitro fertilization ("IVF") treatment in an attempt to conceive a child with her husband.

4

26.     Breeden and her husband successfully became pregnant in or about August 2004.

27.     In or about November 2004, Breeden informed her TBU colleagues that she was pregnant.

28.     In or about November 2004, Breeden notified Human Resources and her colleagues of the estimated three-month maternity leave period.

29.     In or about November 2004, prior to submitting a formal leave request, Breeden discussed her plan to return from maternity leave with Human Resources and TBU Vice President Brian O'Callaghan ("O'Callaghan").

30.     In or about November 2004, Breeden informed her customers of her intention to return from work after maternity leave.

31.     In or about November 2004, Breeden also informed other departments in Novartis -- including human resources, marketing, and the scientific operations group – of her return to work after maternity leave.

32.     In or about late December 2004, Breeden notified the new Business Area Manager, Tom Harper ("Harper") of her estimated three-month maternity leave period.

33.     Breeden also used Novartis benefits to help with screening nanny services in anticipation of her return to work.

34.     Breeden continued to travel to her assigned territories until on or about March 23, 2005.

35.     Breeden went on maternity leave in or about the end of March 2005 and returned to work on or about July 13, 2005.

**Novartis Reduced Breeden's Account Portfolio Scope and Potential Immediately Following Breeden's Request for Maternity Leave**

36.     In or about mid-2004, the TBU contracted ZS Associates, a consulting firm, to assess the transplant selling organization design of the Unit.

37.     One of the purposes of the ZS Associates' assessment, as stated in their November 14, 2004 Transplant Business Area Analysis ("Area Analysis"), was to ensure that workload was "fairly balanced" across the country.  Another consideration was "preserving key customer relationships."

38.     In its Area Analysis, ZS Associates recommended that Novartis restructure the TBU from four U.S. regions, Northeast, South, Central, and West, to five U.S. regions, Midwest, West, East Central, Southeast, and Northeast.

39.     Also as a result of the Area Analysis, the TBU Field Account Representatives' title changed due to the regional restructuring to Transplant Account Managers in or about January 2005.

40.     Pursuant to the Area Analysis, TBU management assigned Breeden to the new East Central Division, which included accounts in North Carolina, Tennessee, Kentucky, Ohio, Michigan, Virginia, West Virginia, Washington, D.C., Kansas, Oklahoma, and Arkansas, and was under the leadership of Harper.

41.     The Area Analysis did not make any recommendations for the specific distribution of accounts among TBU Transplant Account Managers assigned to each newly-constructed Division.

42.     It was common knowledge within the TBU that the decision about which Transplant Account Managers were assigned territories within a given region was based primarily on TBU management's desires.

43.    For example, the Wake Forest transplant center was, pursuant to the Area Analysis in the new East Central Region, assigned by Novartis managers to Transplant Account Manager Ruth Ann Sneith's ("Sneith") territory. However, the South regional Manager wanted to keep Wake Forest in his territory, so it was moved to his region.

44.    TBU management removed Breeden's Maryland and Delaware accounts from her then-current portfolio which included Washington, D.C., Northern Virginia; Charlottesville, Virginia; Maryland; and Delaware.

45.    TBU management did not replace Breeden's Maryland and Delaware accounts with others within the newly-formed East Central Division or elsewhere.

46.    Breeden was assigned only nine (9) accounts while the other Transplant Account Managers responsible for marketing the same set of drugs (Myfortic, Simulect, Neoral, Sandimmune, and other Induction) for the TBU had double that amount, with anywhere from fourteen (14) to twenty-five (25) accounts.

47.    In conversations between Breeden and Harper, her direct supervisor Harper repeatedly acknowledged that TBU's reduction of Breeden's territories significantly reduced the scope and potential of Breeden's territory in comparison with the other Transplant Account Managers.

48.    In both Breeden's mid-year and annual 2005 written reviews, Harper noted that Breeden "experienced a significant territory ch[ange] at the start of 05 and lost two key acc[ounts] where she had placed considerable effort during the previous couple [years]."

49.    In Breeden's annual 2005 written review, Harper stated further that "a combination of things (not the least of which was the changed territory[)] have affected Kate's ability to perform at her highest level in 05."

7

50.      Finally, Harper stated in Breeden's annual 2005 written review that he "appreciated Kate's excellent attitude when facing significant changes in her territory at the beginning of the year.  These changes clearly put Kate in a difficult starting point, as they had been lower focus accounts previously."

## Novartis Reduced Breeden's Account Portfolio Scope and Potential Because She Became Pregnant and Went on Maternity Leave

51.      Breeden was informed of the TBU territorial realignment on a January 2005 conference call with TBU Interim Executive Director John Zieger ("Zieger"), O'Callaghan, Harper, and fellow TBU Transplant Account Managers.

52.      During the January 2005 call, O'Callaghan informed Breeden that as a result of the territorial realignment, she was being assigned to the newly-formed East Central region.

53.      TBU management severely reduced the scope and potential of Breeden's accounts by removing half of the territory for which she was responsible because she had attempted to become, and successfully became, pregnant and was scheduled to go on maternity leave.

54.      During the January 2005 conference call, O'Callaghan told Breeden that because she was being assigned to the East Central region, she would lose her Maryland and Delaware accounts which were located in the newly reconfigured Northeast region.

55.      When Breeden expressed her concern during the January 2005 conference call about the severe reduction in her overall territory – and, therefore, account scope and potential -- O'Callaghan referred to Breeden's maternity leave scheduled for Spring 2005 and said "you aren't coming back anyway, right?"

8

56.     It was only after Breeden's further prodding on the issue that O'Callaghan assured Breeden that her territory would be increased or compensated somehow.

57.     On several occasions before and during Breeden's previously-scheduled maternity leave, O'Callaghan canvassed Breeden's colleagues whether Breeden intended to return to work from maternity leave.

58.     On one such occasion, O'Callaghan remarked to Transplant Account Manager Mendy McGuire ("McGuire") and several other employees in an informal gathering "well, Kate is not coming back [from maternity leave] is she?"

59.     On another such occasion, O'Callaghan asked Director of Transplant Training Cathi Strizzi ("Strizzi") if Breeden was planning on returning to work after maternity leave.

60.     O'Callaghan never again discussed Breeden's request for additional territory with her, despite her repeated requests.

61.     In or about mid-January 2005, Breeden turned to Harper, the new Business Area Manager for the East Central Division, about replacing the accounts Novartis took from her during the territory realignment.

62.     Prior to going on maternity leave, Breeden spoke with Harper on at least five (5) occasions about assigning additional accounts to her territory to make up for TBU management's decision to cut her territory without compensating the loss with other accounts.

63.     During each of these conversations, which occurred between January to March 2005, Harper reassured Breeden that she would be "made whole."

64.     In one such discussion, Breeden asked Harper about moving the Maryland centers she had successfully served previously back to her portfolio, but Harper refused and

commented that Roger Samartino ("Samartino"), Manager of the Northeast Division, would "never let it go."

65.    Breeden was frustrated by Harper's rejection of her suggested solution. In light of the fact that Harper made an exception to the regional boundaries with Wake Forest, Breeden believed her suggestion should have been discussed with Samartino.

66.    At no time did Harper state that the new regional boundaries Novartis adopted from the Area Analysis were a factor in refusing the return of the Maryland Centers to Breeden's portfolio.

67.    During Breeden's last conversation with Harper prior to going on maternity leave, Harper told Breeden that "we'll look at [your territories] when you come back [from maternity leave]."

68.    Other Transplant Account Managers' portfolios were changed due to the Area Analysis.

69.    Breeden was the only Transplant Account Manager in the country whose territory was significantly cut due to ZS Associates' regional realignment recommendations in the Area Analysis or for any other reason.

70.    Breeden was the only Transplant Account Manager in the country who was not "made whole" after the territorial realignment by being given a replacement territory after the loss of the Maryland and Delaware accounts.

71.    Novartis' 2005 removal of Breeden's existing accounts without compensation of new accounts was also inconsistent with its protocol during previous territorial realignments.

72.      Previous TBU territory realignments, such as the 2003 TBU territorial realignment, resulted in assignment of accounts in equal scope and potential among all Transplant Account Managers.

73.      For instance, during the 2003 TBU territorial realignment, Novartis reassigned Breeden's Richmond, Virginia accounts to Account Representative Ruth Anne Sneith ("Sneith") to accommodate Sneith's loss of territories. However, Novartis compensated Breeden's territory loss with the Maryland and Delaware accounts, which were equally large in scope and potential.

74.      Also during the 2003 realignment, and despite North Carolina being in the East Division, certain North Carolina centers that had been assigned to Sneith were transferred to account representative Marty Wessi ("Wessi") in the South region.

75.      The transfer of North Carolina centers to Wessi occurred because of his medical condition. TBU management accommodated Wessi by assigning centers closer to his home so that he would not have to travel as much.

**Novartis failed to restore Breeden's Account Portfolio to an Equal Scope and Potential After Returning From Maternity Leave and Continued to Engage in Discriminatory Acts Against Her**

76.      Breeden returned from maternity leave on or about July 15, 2005.

77.      Despite his commitment to do so prior to Breeden's maternity leave, Harper never initiated any discussions regarding compensation for Breeden's lost territory upon her return to work.

78.      Breeden raised the issue of her reduced territory again with Harper during both her semi-annual and annual 2005 performance reviews.

79.     During both of her 2005 performance reviews, Breeden asked Harper if TBU management would assign her the Richmond, Virginia territory she had managed successfully prior to her maternity leave and the 2003 realignment, currently in Sneith's portfolio.

80.     On both occasions, Harper responded negatively to Breeden's proposal, stating that he would not take away Sneith's territory because "she was single" and because of Sneith's single status, Sneith needed the territory more than Breeden.

81.     At no time did Harper state that the new regional boundaries Novartis adopted from the Area Analysis were a factor in refusing the return of the Richmond, Virginia accounts to Breeden's portfolio.

82.     Nonetheless, throughout 2005, Harper continued to represent to Breeden that TBU management would make Breeden "whole."

83.     In or about April 2006, Breeden began IVF treatment in an as-yet-unsuccessful attempt to conceive a second child.

84.     Prior to undergoing treatment, Breeden informed Harper that she would need to undergo several timed procedures for which she planned to take personal and vacation leave.

85.     In response to Breeden's notification of a new round of IVF treatments to become pregnant, Harper engaged in a series of actions that were uncharacteristic and inconsistent with Novartis' typical procedures.

86.     During their April 2006 conversation about Breeden's IVF treatments, Harper asked Breeden whether the IVF procedures would be "distracting" from her work.

87.    Also during their April 2006 conversation, Harper instructed Breeden to make sure that the IVF procedures did not "interfere" with her work.

88.    The IVF process that Breeden underwent involved several steps which adhere to a strict schedule of self-injected medications and include, in general terms, monitoring and stimulating egg development in the ovaries, egg collection, sperm collection, fertilization, and transfer to the uterus.  Outside of medication injections, Breeden's treatments were conducted in a doctor's office.  Because it is not guaranteed that each step would successfully lead to the next, Breeden was required to be available to participate as the process progressed.

89.    During the process of one of Breeden's IVF treatments in 2006, Breeden was unable to travel to attend an internal meeting in Houston, Texas.

90.    Harper required Breeden to produce a doctor's note to excuse her absence from the meeting, claiming that management wanted to make sure that employees did not "blow off" the meeting.

91.    Prior to Harper's request for the doctor's note, Breeden had outstanding attendance at meetings throughout her then-six years of employment with Novartis.

92.    No other TBU employee was required to produce a doctor's note when missing a meeting while on previously-scheduled vacation, sick, or personal leave.

93.    TBU management failed to assign accounts to increase Breeden's portfolio throughout 2006 and 2007 despite Harper and others in TBU management continuing to acknowledge how difficult the reduction in accounts made it for Breeden to maintain her sales numbers in comparison to her fellow Transplant Account Managers.

13

94.     For instance, on or about January 2007, the Transplant Account Managers in the East Central region presented annual business plans to Harper, Huw Jones, Executive Director, Transplant Commercial Operations ("Jones"), and John Weinberg, Executive Director of Marketing ("Weinberg").

95.     During the January 2007 meeting, both Jones and Weinberg acknowledged that Breeden's reduced territory resulted in a sales potential that was not even one-quarter of the other Transplant Area Managers.

96.     During the January 2007 meeting, both Jones and Weinberg stated that TBU management would do something to increase the potential of Breeden's area and make the distribution more "fair."

97.     Moreover, Breeden continued to raise the issue of her small portfolio with Harper throughout 2007, speaking with Harper on at least ten (10) occasions.

98.     During each of these occasions, Harper told Breeden that there would be another national-level realignment of the Unit as took place in 2005 and that management intended to address the size of Breeden's territory at that time.

99.     On at least one of these occasions, Harper assured Breeden that she would be "happy" with the result of the forthcoming national-level realignment.

100.     Despite these assurances and despite the fact that in Breeden's 2007 mid-year review, Harper acknowledged once again that "Kate's territory poses significant challenges," TBU management never increased Breeden's portfolio size in 2007.

101.     Although Breeden was frustrated and distressed by TBU management's failure to address the disproportionate size, or scope and potential, of her territory versus all other Transplant Area Managers, Breeden never raised the issue with Human Resources

because she relied on management's frequent assurances that she would be given additional accounts to make things fair and to align her with the other Transplant Area Managers.

## Novartis Wrongfully Terminated Breeden

102.    On or about January 10, 2008, Harper called Breeden to say that Michael Barr ("Barr"), Head, US Human Resources, Novartis Infectious Diseases, Transplantation & Immunology since on or about December 2006, was on the telephone and wanted to speak with her.

103.    During the call on or about January 10, 2008, Barr informed Breeden that "outside consultants" had decided to eliminate her territory.

104.    During the call on or about January 10, 2008, Barr told Breeden that the decision to terminate her was based purely on the size, scope, and potential of her territory and not performance.

105.    Barr also told Breeden that Novartis was planning to hire a new Transplant Account Manager in the Midwest.

106.    Barr also represented to Breeden that he would look for another position for Breeden within the company.

107.    Breeden was the only Transplant Area Manager in the country whose territory was eliminated in or about January 2008.

108.    Novartis assigned Sneith -- who is female and single and has no children -- Breeden's territory.

109.    When Breeden called Barr on or about January 17, 2008 to inquire into the status of his search for a new position for Breeden, Barr informed Breeden that there were no positions available either within her or another region.

110.     During their call on or about January 17, 2008, Barr also told Breeden that when he stated in the January 10, 2008 call that he would try to find a new position for her, there were several positions available but claimed, only one week later, TBU management had imposed a "hiring freeze."

111.     Harper never discussed Breeden's termination with her.

112.     The only communication Breeden had with Harper that was related to her termination was when he called Breeden in or about late January 2008 to schedule a time for him to retrieve Breeden's company laptop.

113.     Neither Harper nor anyone else in Novartis discussed with Breeden whether she would be willing to move to a new territory elsewhere in the U.S. or about other opportunities involving new medications that were being developed by Novartis.

**Breeden Reported to Human Resources that Her Termination was Discriminatory**

114.     During Breeden's January 17, 2008 call with Barr, Breeden recounted to Barr the sequence of her original discussion about her IVF treatment with O'Callaghan, O'Callaghan's reduction of her account portfolio, her on-going discussions with Harper and O'Callaghan regarding the inadequate size, scope, and potential of her territory since her maternity leave, her repeated requests of TBU management for additional accounts, and TBU management's repeated assurances that additional accounts would be assigned to her portfolio upon her return from maternity leave.

115.     In response, Barr commented to Breeden that "things happened in Transplant before [his] time that were not right."

116.     During the January 17, 2008 call, Breeden explicitly told Barr that she believed she was treated unfairly upon her return from maternity leave.

16

117.     Novartis never conducted an investigation into Breeden's claims.

118.     Breeden's last day of employment with Novartis was January 26, 2008.

### FIRST CAUSE OF ACTION
**Sex-Based Discrimination**
(Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2007))

119.     The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

120.     At all relevant times herein, Novartis has been an "employer" as the term is defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

121.     At all relevant times herein, Breeden has been an "employee" as the term is defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f).

122.     Breeden is female, has been pregnant, is currently trying to become pregnant, and has family responsibilities.

123.     Novartis discriminated against Breeden because she is female, was pregnant, is currently trying to become pregnant, and has family responsibilities, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

124.     Novartis' discriminatory treatment against Breeden included, but is not limited to, Novartis' reduction of the scope and potential of Breeden's accounts because she went on maternity leave; Novartis' failure to assign Breeden new accounts so that the scope and potential of her accounts was equal to those of her comparators because she had family responsibilities and attempted to have a second child; and Novartis' wrongful termination of Breeden and reassignment of Breeden's territory upon her termination to a comparator who was a single employee without family responsibilities.

17

125.      Novartis wrongfully terminated Breeden, in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

126.      Upon Breeden's termination, Novartis reassigned Breeden's accounts to a

female Transplant Account Manager who is single and has no children.

127.      Throughout Breeden's employment with Novartis, Novartis consistently rated

a Breeden a "strong performer."

128.      At the time of Breeden's termination, Breeden was performing her job duties

at a level that met or exceeded Novartis' legitimate expectations.

129.      Novartis' stated reasons for terminating Breeden are pretextual.

### SECOND CAUSE OF ACTION
#### Interference
(Family and Medical Leave Act of 1993 ("FMLA"), § 29 U.S.C. 2601 *et seq.* (2007))

130.      The allegations of the preceding paragraphs are re-alleged as if fully set forth

below.

131.      At all relevant times herein, Novartis was an "employer" as defined by the

Family and Medical Leave Act, 29 U.S.C. § 2611(a)(4)(A).

132.      At all relevant times herein, Breeden was an "employee" as defined by the

Family and Medical Leave Act, 29 U.S.C. § 2611(a)(2)(A).

133.      At all relevant times herein, Breeden had a right under the Family and

Medical Leave Act, 29 U.S.C. § 2612 (a)(1) to twelve workweeks of leave during any twelve

month period for family and health-related matters.

134.      Upon an exercise of her rights under the Family and Medical Leave Act, 29

U.S.C. § 2612 (a)(1), Breeden also had a right under § 2614(a)(1)(A)-(B), 29 C.F.R. §§

825.214, 825.2155(a) to be restored by Novartis to an equivalent position with equivalent terms and conditions of employment.

135.     During the course of her employment with Novartis, Breeden exercised her right under the Family and Medical Leave Act, 29 U.S.C. § 2612(a)(1)(D).

136.     At all relevant times herein, Novartis had a duty under the Family Medical Leave Act, 29 U.S.C. § 2615(a)(1) to not interfere with Breeden's rights under the Act.

137.     Novartis interfered with Breeden's rights under the Family Medical Leave Act because it reduced Breeden's number, scope, and potential of accounts upon learning of her plan to exercise her FMLA rights to take maternity leave.

138.     Novartis interfered with Breeden's rights under the Family Medical Leave Act because it failed to restore Breeden to the equivalent position upon her return from maternity leave.

## PRAYER FOR RELIEF

Based on the foregoing discrimination, Breeden respectfully requests that she be awarded the following relief:

139.     Economic damages for actual monetary losses sustained as direct result of the discrimination and compensation for any special damages sustained as a result of the discrimination;

140.     Economic damages for actual monetary losses sustained as direct result of the FMLA violation, the interest on the amount calculated at the prevailing rate, and an additional amount as liquidated damages equal to the sum of the amount;

141.     Compensatory (non-economic) damages, including damages for mental and emotional distress;

142.    Punitive damages to punish Novartis for knowing discrimination and violation of the FMLA and to deter them from similar conduct toward other employees;

143.    Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by Novartis; and

144.    Reasonable litigation costs, expert fees and reasonable attorneys' fees, together with all other relief available from law and equity.

Respectfully submitted
*By Counsel,*

R. Scott Oswald, DC Bar No. 458859
Adam Augustine Carter, DC Bar No. 437381
Gregory R. Sharma-Holt, *pro hac vice*
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2826
(202) 261-2835 (facsimile)
*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff demands a jury for all issues proper to be so tried.

Adam Augustine Carter, Esq.

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Mary Kate Breeden    88888 | Novartis Pharmaceuticals Corporation |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Alexandria, VA   (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Morris County, NJ   (IN U.S. PLAINTIFF CASES ONLY)   NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | |
|---|---|
| The Employment Law Group, P.C. 888 17th Street, NW, Suite 900 Washington, DC 20006 (202) 331-2883 | Case: 1:08-cv-00625 Assigned To : Robertson, James Assign. Date : 4/10/2008 Description: Employ. Discrim. |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ◉ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

- ☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)** OR ○ **F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

①

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Sex-based discrimination (Title VII) 42 U.S.C. § 2000e et seq. (2007) ; Interference (FMLA) 29 U.S.C. § 2615(a)(1) (2007).

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** _____ JURY DEMAND: | Check YES only if demanded in complaint YES ☒   NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 4/10/08   SIGNATURE OF ATTORNEY OF RECORD _[signature]_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.