UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARY KATE BREEDEN**<br>**2908 Russell Road**<br>**Alexandria, Virginia 22305,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**Novartis Pharmaceuticals Corporation**<br>**One Health Plaza**<br>**East Hanover, New Jersey 07936-1080,**<br><br>**Serve Registered Agent:**<br><br>      **CT Corporation**<br>      **1015 15th Street NW, Suite 1000**<br>      **Washington, DC 20005,**<br><br>      **Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>**Case No.  1:08-cv-00625**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FIRST AMENDED CIVIL COMPLAINT FOR EQUITABLE
AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.      Plaintiff, Mary Kate Breeden ("Breeden"), files this First Amended Civil

Complaint of interference and retaliation in violation of the Family and Medical Leave Act of

1993, 29 U.S.C. § 2615(a)(1) (2007) ("FMLA") against Novartis Pharmaceuticals

Corporation ("Novartis").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to both 28 U.S.C. § 1331 and 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

4.      Plaintiff Mary Kate Breeden is domiciled in Virginia and, until her wrongful termination on January 26, 2008, was a Transplant Account Manager ("TAM") for Novartis. The majority of the accounts for which Breeden was responsible at the time of her termination were located in Washington, D.C.

5.      Defendant Novartis Pharmaceuticals Corporation is a Delaware corporation that conducts business in Washington, D.C.  Novartis is engaged in commerce or an industry or activity affecting commerce and employs 50 or more employees.

## FACTUAL ALLEGATIONS

**Background**

6.      Novartis Pharmaceuticals Corporation researches, develops, and markets prescription drugs to treat a range of disease areas including, but not limited to, organ transplantation.

7.      Novartis hired Breeden on or about November 20, 2000 as one of twenty-six (26) Transplant Business Unit ("TBU" or "Unit") Field Account Representatives nationwide.

8.     Throughout Breeden's employment, Novartis rated Breeden a "strong performer" or "good solid performer" in semi-annual and annual performance evaluations because she consistently met Novartis' performance goals for her.

9.     Throughout Breeden's employment, supervisors consistently praised Breeden's performance.

10.     Breeden's supervisors consistently praised Breeden for her technical knowledge, client interaction and service, and dedication to her position.

11.     In 2006, Breeden's supervisor commended her for ranking seven (7) in sales among twenty-five (25), or in the top one-third, of her comparators nationwide.

12.     At the date of her hire, Breeden was not pregnant, was not trying to become pregnant, and had no children.

13.     At the time of Breeden's hire and throughout the course of her employment, none of Breeden's female comparators who had young children remained with Novartis more than about a year following maternity leave due, in part, to Novartis' negative treatment of female employees with young children.

**Novartis Was on Notice of Breeden's Intent to Undergo IVF Treatment as a Result of an Invasive and Inappropriate Conversation Prompted by TBU Vice President O'Callaghan**

14.     During a field visit with Breeden in or about June 2004, Brian O'Callaghan randomly asked Breeden why she did not have any children.

15.     Although Breeden was uncomfortable with O'Callaghan's question, Breeden felt obligated to respond because O'Callaghan was Breeden's superior.

16.     In response to O'Callaghan's question during the field visit, Breeden explained to O'Callaghan in confidence that she hoped to have children and was undergoing in IVF treatment to conceive.

17.      Breeden informed O'Callaghan that no one in Novartis was aware of her effort to become pregnant.

18.      Rather than drop the issue, O'Callaghan then asked Breeden if she planned to return to work after having a child.

19.      Breeden affirmed to O'Callaghan that she would return to work after giving birth if she were fortunate enough to have a child.

20.      Despite Breeden's obvious discomfort and repeated attempts to change the subject of the conversation back to work-related matters, O'Callaghan continued to ask Breeden personal questions about why she was unable to conceive and her work plans post-pregnancy.

21.      Breeden felt incredibly embarrassed by, and uncomfortable with, O'Callaghan's deeply personal questions during the field visit on or about June 2004.

22.      O'Callaghan never asked any male employee of Novartis questions about having or attempting to conceive children.

23.      O'Callaghan broke the confidentiality of his discussion with Breeden and informed Transplant Account Manager Mendy McGuire ("McGuire") and other TBU employees that Breeden was utilizing an IVF process to become pregnant.

24.      Because of O'Callaghan, Breeden's attempts to become pregnant utilizing IVF became widely known among Novartis' TBU employees.

**Breeden Underwent In Vitro Fertilization Treatment and Became Pregnant**

25.      In or about 2004, Breeden underwent in vitro fertilization ("IVF") treatment in an attempt to conceive a child with her husband.

26.     Breeden and her husband successfully became pregnant in or about August 2004.

27.     In or about November 2004, Breeden informed her TBU colleagues that she was pregnant.

28.     In or about November 2004, Breeden notified Human Resources and her colleagues of the estimated three-month maternity leave period.

29.     In or about November 2004, prior to submitting a formal leave request, Breeden discussed her plan to return from maternity leave with Human Resources and TBU Vice President Brian O'Callaghan ("O'Callaghan").

30.     In or about November 2004, Breeden informed her customers of her intention to return from work after maternity leave.

31.     In or about November 2004, Breeden also informed other departments in Novartis -- including human resources, marketing, and the scientific operations group – of her return to work after maternity leave.

32.     In or about late December 2004, Breeden notified the new Business Area Manager, Tom Harper ("Harper") of her estimated three-month maternity leave period.

33.     Breeden also used Novartis benefits to help with screening nanny services in anticipation of her return to work.

34.     Breeden continued to travel to her assigned territories until on or about March 23, 2005.

35.     Breeden went on maternity leave in or about the end of March 2005 and returned to work on or about July 13, 2005.

**Novartis Reduced Breeden's Account Portfolio Scope and Potential Immediately Following
Breeden's Request for Maternity Leave**

36.    In or about mid-2004, the TBU contracted ZS Associates, a consulting firm, to
assess the transplant selling organization design of the Unit.

37.    One of the purposes of the ZS Associates' assessment, as stated in their
November 14, 2004 Transplant Business Area Analysis ("Area Analysis"), was to ensure that
workload was "fairly balanced" across the country.  Another consideration was "preserving
key customer relationships."

38.    In its Area Analysis, ZS Associates recommended that Novartis restructure
the TBU from four U.S. regions, Northeast, South, Central, and West, to five U.S. regions,
Midwest, West, East Central, Southeast, and Northeast.

39.    Also as a result of the Area Analysis, the TBU Field Account Representatives'
title changed due to the regional restructuring to Transplant Account Managers in or about
January 2005.

40.    Pursuant to the Area Analysis, TBU management assigned Breeden to the new
East Central Division, which included accounts in North Carolina, Tennessee, Kentucky,
Ohio, Michigan, Virginia, West Virginia, Washington, D.C., Kansas, Oklahoma, and
Arkansas, and was under the leadership of Harper.

41.    The Area Analysis did not make any recommendations for the specific
distribution of accounts among TBU Transplant Account Managers assigned to each newly-
constructed Division.

42.    It was common knowledge within the TBU that the decision about which
Transplant Account Managers were assigned territories within a given region was based
primarily on TBU management's desires.

43.    For example, the Wake Forest transplant center was, pursuant to the Area Analysis in the new East Central Region, assigned by Novartis managers to Transplant Account Manager Ruth Ann Sneith's ("Sneith") territory.  However, the South regional Manager wanted to keep Wake Forest in his territory, so it was moved to his region.

44.    TBU management removed Breeden's Maryland and Delaware accounts from her then-current portfolio which included Washington, D.C., Northern Virginia; Charlottesville, Virginia; Maryland; and Delaware.

45.    TBU management did not replace Breeden's Maryland and Delaware accounts with others within the newly-formed East Central Division or elsewhere.

46.    Breeden was assigned only nine (9) accounts while the other Transplant Account Managers responsible for marketing the same set of drugs (Myfortic, Simulect, Neoral, Sandimmune, and other Induction) for the TBU had double that amount, with anywhere from fourteen (14) to twenty-five (25) accounts.

47.    In conversations between Breeden and Harper, her direct supervisor Harper repeatedly acknowledged that TBU's reduction of Breeden's territories significantly reduced the scope and potential of Breeden's territory in comparison with the other Transplant Account Managers.

48.    In both Breeden's mid-year and annual 2005 written reviews, Harper noted that Breeden "experienced a significant territory ch[ange] at the start of 05 and lost two key acc[ounts] where she had placed considerable effort during the previous couple [years]."

49.    In Breeden's annual 2005 written review, Harper stated further that "a combination of things (not the least of which was the changed territory[)] have affected Kate's ability to perform at her highest level in 05."

7

50.      Finally, Harper stated in Breeden's annual 2005 written review that he "appreciated Kate's excellent attitude when facing significant changes in her territory at the beginning of the year. These changes clearly put Kate in a difficult starting point, as they had been lower focus accounts previously."

## Novartis Reduced Breeden's Account Portfolio Scope and Potential Because She Became Pregnant and Went on Maternity Leave

51.      Breeden was informed of the TBU territorial realignment on a January 2005 conference call with TBU Interim Executive Director John Zieger ("Zieger"), O'Callaghan, Harper, and fellow TBU Transplant Account Managers.

52.      During the January 2005 call, O'Callaghan informed Breeden that as a result of the territorial realignment, she was being assigned to the newly-formed East Central region.

53.      TBU management severely reduced the scope and potential of Breeden's accounts by removing half of the territory for which she was responsible because she had attempted to become, and successfully became, pregnant and was scheduled to go on maternity leave.

54.      During the January 2005 conference call, O'Callaghan told Breeden that because she was being assigned to the East Central region, she would lose her Maryland and Delaware accounts which were located in the newly reconfigured Northeast region.

55.      When Breeden expressed her concern during the January 2005 conference call about the severe reduction in her overall territory -- and, therefore, account scope and potential -- O'Callaghan referred to Breeden's maternity leave scheduled for Spring 2005 and said "you aren't coming back anyway, right?"

8

56.    It was only after Breeden's further prodding on the issue that O'Callaghan assured Breeden that her territory would be increased or compensated somehow.

57.    On several occasions before and during Breeden's previously-scheduled maternity leave, O'Callaghan canvassed Breeden's colleagues whether Breeden intended to return to work from maternity leave.

58.    On one such occasion, O'Callaghan remarked to Transplant Account Manager Mendy McGuire ("McGuire") and several other employees in an informal gathering "well, Kate is not coming back [from maternity leave] is she?"

59.    On another such occasion, O'Callaghan asked Director of Transplant Training Cathi Strizzi ("Strizzi") if Breeden was planning on returning to work after maternity leave.

60.    O'Callaghan never again discussed Breeden's request for additional territory with her, despite her repeated requests.

61.    In or about mid-January 2005, Breeden turned to Harper, the new Business Area Manager for the East Central Division, about replacing the accounts Novartis took from her during the territory realignment.

62.    Prior to going on maternity leave, Breeden spoke with Harper on at least five (5) occasions about assigning additional accounts to her territory to make up for TBU management's decision to cut her territory without compensating the loss with other accounts.

63.    During each of these conversations, which occurred between January to March 2005, Harper reassured Breeden that she would be "made whole."

64.    In one such discussion, Breeden asked Harper about moving the Maryland centers she had successfully served previously back to her portfolio, but Harper refused and

commented that Roger Samartino ("Samartino"), Manager of the Northeast Division, would "never let it go."

65.    Breeden was frustrated by Harper's rejection of her suggested solution. In light of the fact that Harper made an exception to the regional boundaries with Wake Forest, Breeden believed her suggestion should have been discussed with Samartino.

66.    At no time did Harper state that the new regional boundaries Novartis adopted from the Area Analysis were a factor in refusing the return of the Maryland Centers to Breeden's portfolio.

67.    During Breeden's last conversation with Harper prior to going on maternity leave, Harper told Breeden that "we'll look at [your territories] when you come back [from maternity leave]."

68.    Other Transplant Account Managers' portfolios were changed due to the Area Analysis.

69.    Breeden was the only Transplant Account Manager in the country whose territory was significantly cut due to ZS Associates' regional realignment recommendations in the Area Analysis or for any other reason.

70.    Breeden was the only Transplant Account Manager in the country who was not "made whole" after the territorial realignment by being given a replacement territory after the loss of the Maryland and Delaware accounts.

71.    Novartis' 2005 removal of Breeden's existing accounts without compensation of new accounts was also inconsistent with its protocol during previous territorial realignments.

72.        Previous TBU territory realignments, such as the 2003 TBU territorial realignment, resulted in assignment of accounts in equal scope and potential among all Transplant Account Managers.

73.        For instance, during the 2003 TBU territorial realignment, Novartis reassigned Breeden's Richmond, Virginia accounts to Account Representative Ruth Anne Sneith ("Sneith") to accommodate Sneith's loss of territories.  However, Novartis compensated Breeden's territory loss with the Maryland and Delaware accounts, which were equally large in scope and potential.

74.        Also during the 2003 realignment, and despite North Carolina being in the East Division, certain North Carolina centers that had been assigned to Sneith were transferred to account representative Marty Wessi ("Wessi") in the South region.

75.        The transfer of North Carolina centers to Wessi occurred because of his medical condition.  TBU management accommodated Wessi by assigning centers closer to his home so that he would not have to travel as much.

**Novartis failed to restore Breeden's Account Portfolio to an Equal Scope and Potential After Returning From Maternity Leave and Continued to Engage in Discriminatory Acts Against Her**

76.        Breeden returned from maternity leave on or about July 15, 2005.

77.        Despite his commitment to do so prior to Breeden's maternity leave, Harper never initiated any discussions regarding compensation for Breeden's lost territory upon her return to work.

78.        Breeden raised the issue of her reduced territory again with Harper during both her semi-annual and annual 2005 performance reviews.

11

79.        During both of her 2005 performance reviews, Breeden asked Harper if TBU management would assign her the Richmond, Virginia territory she had managed successfully prior to her maternity leave and the 2003 realignment, currently in Sneith's portfolio.

80.        On both occasions, Harper responded negatively to Breeden's proposal, stating that he would not take away Sneith's territory because "she was single" and because of Sneith's single status, Sneith needed the territory more than Breeden.

81.        At no time did Harper state that the new regional boundaries Novartis adopted from the Area Analysis were a factor in refusing the return of the Richmond, Virginia accounts to Breeden's portfolio.

82.        Nonetheless, throughout 2005, Harper continued to represent to Breeden that TBU management would make Breeden "whole."

83.        In or about April 2006, Breeden began IVF treatment in an as-yet-unsuccessful attempt to conceive a second child.

84.        Prior to undergoing treatment, Breeden informed Harper that she would need to undergo several timed procedures for which she planned to take personal and vacation leave.

85.        In response to Breeden's notification of a new round of IVF treatments to become pregnant, Harper engaged in a series of actions that were uncharacteristic and inconsistent with Novartis' typical procedures.

86.        During their April 2006 conversation about Breeden's IVF treatments, Harper asked Breeden whether the IVF procedures would be "distracting" from her work.

87.      Also during their April 2006 conversation, Harper instructed Breeden to make sure that the IVF procedures did not "interfere" with her work.

88.      The IVF process that Breeden underwent involved several steps which adhere to a strict schedule of self-injected medications and include, in general terms, monitoring and stimulating egg development in the ovaries, egg collection, sperm collection, fertilization, and transfer to the uterus.  Outside of medication injections, Breeden's treatments were conducted in a doctor's office.  Because it is not guaranteed that each step would successfully lead to the next, Breeden was required to be available to participate as the process progressed.

89.      During the process of one of Breeden's IVF treatments in 2006, Breeden was unable to travel to attend an internal meeting in Houston, Texas.

90.      Harper required Breeden to produce a doctor's note to excuse her absence from the meeting, claiming that management wanted to make sure that employees did not "blow off" the meeting.

91.      Prior to Harper's request for the doctor's note, Breeden had outstanding attendance at meetings throughout her then-six years of employment with Novartis.

92.      No other TBU employee was required to produce a doctor's note when missing a meeting while on previously-scheduled vacation, sick, or personal leave.

93.      TBU management failed to assign accounts to increase Breeden's portfolio throughout 2006 and 2007 despite Harper and others in TBU management continuing to acknowledge how difficult the reduction in accounts made it for Breeden to maintain her sales numbers in comparison to her fellow Transplant Account Managers.

13

94.    For instance, on or about January 2007, the Transplant Account Managers in the East Central region presented annual business plans to Harper, Huw Jones, Executive Director, Transplant Commercial Operations ("Jones"), and John Weinberg, Executive Director of Marketing ("Weinberg").

95.    During the January 2007 meeting, both Jones and Weinberg acknowledged that Breeden's reduced territory resulted in a sales potential that was not even one-quarter of the other Transplant Area Managers.

96.    During the January 2007 meeting, both Jones and Weinberg stated that TBU management would do something to increase the potential of Breeden's area and make the distribution more "fair."

97.    Moreover, Breeden continued to raise the issue of her small portfolio with Harper throughout 2007, speaking with Harper on at least ten (10) occasions.

98.    During each of these occasions, Harper told Breeden that there would be another national-level realignment of the Unit as took place in 2005 and that management intended to address the size of Breeden's territory at that time.

99.    On at least one of these occasions, Harper assured Breeden that she would be "happy" with the result of the forthcoming national-level realignment.

100.    Despite these assurances and despite the fact that in Breeden's 2007 mid-year review, Harper acknowledged once again that "Kate's territory poses significant challenges," TBU management never increased Breeden's portfolio size in 2007.

101.    Although Breeden was frustrated and distressed by TBU management's failure to address the disproportionate size, or scope and potential, of her territory versus all other Transplant Area Managers, Breeden never raised the issue with Human Resources

because she relied on management's frequent assurances that she would be given additional accounts to make things fair and to align her with the other Transplant Area Managers.

**Novartis Wrongfully Terminated Breeden**

102.    On or about January 10, 2008, Harper called Breeden to say that Michael Barr ("Barr"), Head, US Human Resources, Novartis Infectious Diseases, Transplantation & Immunology since on or about December 2006, was on the telephone and wanted to speak with her.

103.    During the call on or about January 10, 2008, Barr informed Breeden that "outside consultants" had decided to eliminate her territory.

104.    During the call on or about January 10, 2008, Barr told Breeden that the decision to terminate her was based purely on the size, scope, and potential of her territory and not performance.

105.    Barr also told Breeden that Novartis was planning to hire a new Transplant Account Manager in the Midwest.

106.    Barr also represented to Breeden that he would look for another position for Breeden within the company.

107.    Breeden was the only Transplant Area Manager in the country whose territory was eliminated in or about January 2008.

108.    Novartis assigned Sneith – who is female and single and has no children – Breeden's territory.

109.    When Breeden called Barr on or about January 17, 2008 to inquire into the status of his search for a new position for Breeden, Barr informed Breeden that there were no positions available either within her or another region.

110.    During their call on or about January 17, 2008, Barr also told Breeden that when he stated in the January 10, 2008 call that he would try to find a new position for her, there were several positions available but claimed, only one week later, TBU management had imposed a "hiring freeze."

111.    Harper never discussed Breeden's termination with her.

112.    The only communication Breeden had with Harper that was related to her termination was when he called Breeden in or about late January 2008 to schedule a time for him to retrieve Breeden's company laptop.

113.    Neither Harper nor anyone else in Novartis discussed with Breeden whether she would be willing to move to a new territory elsewhere in the U.S. or about other opportunities involving new medications that were being developed by Novartis.

**Breeden Reported to Human Resources that Her Termination was Discriminatory**

114.    During Breeden's January 17, 2008 call with Barr, Breeden recounted to Barr the sequence of her original discussion about her IVF treatment with O'Callaghan, O'Callaghan's reduction of her account portfolio, her on-going discussions with Harper and O'Callaghan regarding the inadequate size, scope, and potential of her territory since her maternity leave, her repeated requests of TBU management for additional accounts, and TBU management's repeated assurances that additional accounts would be assigned to her portfolio upon her return from maternity leave.

115.    In response, Barr commented to Breeden that "things happened in Transplant before [his] time that were not right."

116.    During the January 17, 2008 call, Breeden explicitly told Barr that she believed she was treated unfairly upon her return from maternity leave.

117.    Novartis never conducted an investigation into Breeden's claims.

118.    Breeden's last day of employment with Novartis was January 26, 2008.

### FIRST CAUSE OF ACTION
### Interference
(Family and Medical Leave Act of 1993 ("FMLA"), § 29 U.S.C. 2601 *et seq.* (2007))

119.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

120.    At all relevant times herein, Novartis was an "employer" as defined by the Family and Medical Leave Act, 29 U.S.C. § 2611(a)(4)(A).

121.    At all relevant times herein, Breeden was an "employee" as defined by the Family and Medical Leave Act, 29 U.S.C. § 2611(a)(2)(A).

122.    At all relevant times herein, Breeden had a right under the Family and Medical Leave Act, 29 U.S.C. § 2612 (a)(1) to twelve workweeks of leave during any twelve month period for family and health-related matters.

123.    Upon an exercise of her rights under the Family and Medical Leave Act, 29 U.S.C. § 2612 (a)(1), Breeden also had a right under § 2614(a)(1)(A)-(B), 29 C.F.R. §§ 825.214, 825.2155(a) to be restored by Novartis to an equivalent position with equivalent terms and conditions of employment.

124.    During the course of her employment with Novartis, Breeden exercised her right under the Family and Medical Leave Act, 29 U.S.C. § 2612(a)(1)(D).

125.    At all relevant times herein, Novartis had a duty under the Family Medical Leave Act, 29 U.S.C. § 2615(a)(1) to not interfere with Breeden's rights under the Act.

17

126.    Novartis interfered with Breeden's rights under the Family Medical Leave Act because it reduced Breeden's number, scope, and potential of accounts upon learning of her plan to exercise her FMLA rights to take maternity leave.

127.    Novartis interfered with Breeden's rights under the Family Medical Leave Act because it failed to restore Breeden to the equivalent position upon her return from maternity leave.

### SECOND CAUSE OF ACTION
### Retaliation
(Family and Medical Leave Act of 1993 ("FMLA"), § 29 U.S.C. 2601 *et seq.* (2007))

128.    The allegations of the preceding paragraphs are re-alleged as if fully set forth below.

129.    At all relevant times herein, Novartis was an "employer" as defined by the Family and Medical Leave Act, 29 U.S.C. § 2611(a)(4)(A).

130.    At all relevant times herein, Breeden was an "employee" as defined by the Family and Medical Leave Act, 29 U.S.C. § 2611(a)(2)(A).

131.    At all relevant times herein, Breeden had a right under the Family and Medical Leave Act, 29 U.S.C. § 2612 (a)(1) to twelve workweeks of leave during any twelve month period for family and health-related matters.

132.    During the course of her employment with Novartis, Breeden exercised her rights under the Family and Medical Leave Act, 29 U.S.C. § 2612(a)(1)(D).

133.    At all relevant times herein, Novartis had a duty under the Family Medical Leave Act, 29 U.S.C. § 2615(a)(1) to not retaliate against Breeden for exercising her rights under the Act.

134.     Novartis retaliated against Breeden when it reduced the number, scope, and potential of Breeden's accounts upon learning of her plan to exercise her FMLA rights to take maternity leave and failing to restore Breeden to an equivalent position upon her return from maternity leave.

135.     Novartis willfully and intentionally reduced the number, scope, and potential of Breeden's accounts because she exercised her rights under the Family and Medical Leave Act, 29 U.S.C. § 2612 (a)(1).

136.     Novartis' legitimate business reason for its reduction of the number, scope, and potential of Breeden's accounts is pretext.

## PRAYER FOR RELIEF

Based on the foregoing discrimination, Breeden respectfully requests that she be awarded the following relief:

137.     Economic damages for actual monetary losses sustained as direct result of the discrimination and compensation for any special damages sustained as a result of the discrimination;

138.     Economic damages for actual monetary losses sustained as direct result of the FMLA violation, the interest on the amount calculated at the prevailing rate, and an additional amount as liquidated damages equal to the sum of the amount;

139.     Compensatory (non-economic) damages, including damages for mental and emotional distress;

140.     Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by Novartis; and

141.     Reasonable litigation costs, expert fees and reasonable attorneys' fees,

together with all other relief available from law and equity.


                                   Respectfully submitted
                                   *By Counsel,*


                                   *R Scott Oswald*    GRSH
                                   _____
                                   R. Scott Oswald, DC Bar No. 458859
                                   Gregory R. Sharma-Holt, *pro hac vice*
                                   The Employment Law Group, P.C.
                                   888 17th Street, NW, Suite 900
                                   Washington, D.C. 20006
                                   (202) 261-2826
                                   (202) 261-2835 (facsimile)
                                   *Counsel for Plaintiff*


                          **JURY DEMAND**

Plaintiff demands a jury for all issues proper to be so tried.


                                   *R. Scott Oswald* GRSH
                                   _____
                                   R. Scott Oswald, Esq.